**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTINE M. YOST; ROBERT B.
YOST,
<u>Plaintiffs-Appellants,</u>

No. 98-1790

v.

TRAVELERS INSURANCE COMPANY,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., Chief District Judge.
(CA-97-113-5)

Argued: March 4, 1999

Decided: June 21, 1999

Before WIDENER, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Scott Steven Blass, BORDAS, BORDAS & JIVIDEN,
Wheeling, West Virginia, for Appellants. Avrum Levicoff, BROWN
& LEVICOFF, P.C., Pittsburgh, Pennsylvania, for Appellee. **ON
BRIEF:** James B. Stoneking, BORDAS, BORDAS & JIVIDEN,
Wheeling, West Virginia, for Appellants. Joseph E. Starkey, Jr.,
BROWN & LEVICOFF, P.C., Pittsburgh, Pennsylvania, for Appel-
lee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Christine Yost and Robert Yost, her husband, appeal an order of the district court granting summary judgment to defendant Travelers Insurance Company (Travelers). The Yosts' suit alleged that Travelers had violated a provision of the West Virginia Unfair Trade Practices Act (WVUTPA), W. Va. Code § 33-11-4(9), in the manner in which it had investigated, litigated, and eventually settled a claim the Yosts had asserted against a person insured by Travelers. The district court held that Pennsylvania, rather than West Virginia, law governed the dispute. Because Pennsylvania law does not permit third parties to sue liability insurers for bad-faith conduct in handling claims against their insureds,[1] the Yosts' action was therefore untenable. We affirm the judgment of the district court.

I.

A.

Christine Yost was injured in an automobile accident on June 23, 1995, on an interstate highway near Morgantown, West Virginia. Her car was struck by a vehicle operated by Dean Allen Miller. Miller was drunk at the time of the accident; he fled the scene, but was quickly apprehended. A scant six weeks later, Miller pled guilty to second-offense driving under the influence of alcohol.

The car Miller was driving (1) was owned by a resident of Pennsylvania, Richard Van Norman, (2) was titled and regularly garaged in that state, and (3) was insured by Travelers through a Pennsylvania

_____

[1] **Johnson v. Beane**, 541 Pa. 449, 664 A.2d 96, 99 n.3 (1995) (dicta); Strutz v. State Farm Mut. Ins. Co., 415 Pa. Super. 371, 609 A.2d 569, 571 (1992).

2

agent under a policy specifically drafted and endorsed to conform to Pennsylvania law. Soon after the wreck, both the Yosts and Van Norman contacted Travelers to notify it of the accident and Christine Yost's claim for damages.

Travelers assigned the claim to an adjuster located at its Pittsburgh, Pennsylvania, personal lines claims office. According to the Yosts, Travelers set out to thwart the claim in bad faith. For example, Travelers suggested that the liability policy limit was $15,000, notwithstanding that the policy pledged to meet any state's statutory minimum, which in the case of West Virginia is $20,000. Travelers refused to provide the Yosts with a copy of the policy, and the company further refused to tender the modest policy limits notwithstanding that Miller's plea of guilty to drunk driving made liability all but certain.

On January 10, 1996, the Yosts filed suit against Miller in West Virginia state court. The suit did not bring about a quick resolution of the claim. Instead, according to the Yosts, their suit prompted even more foot-dragging and bad faith by Travelers. Travelers retained local counsel, who filed an answer asserting not only that Miller was without fault and that Mrs. Yost had been contributorily negligent, but also that recovery was barred by such unlikely defenses as assumption of the risk, the statute of limitations, waiver, estoppel, laches, lack of subject-matter jurisdiction, and lack of personal jurisdiction.[2] Apparently someone on Travelers' side decided the answer went too far because an amended answer was later filed deleting the statute of limitations defense and admitting as fact that Miller had indeed been drunk at the time of the accident. The Yosts were not deterred, and eventually Travelers agreed to pay the $20,000 policy limit to them. The Yosts agreed to release Miller, but not Travelers, from any further liability.

B.

On July 10, 1997, the Yosts filed this WVUTPA suit against Travelers in the Circuit Court of Marshall County, West Virginia. Travel-

———————————————————————————————————————

[2] Miller is a resident of the county in which the action was brought.

3

ers removed the case to district court on account of diversity of citizenship, and on August 29, 1997, it moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted. Because Travelers submitted materials extraneous to the pleadings in support of its motion, the district court construed it as a motion for summary judgment under Fed. R. Civ. P. 56, and on May 18, 1998, the court granted summary judgment for Travelers. In a memorandum opinion the court explained that, while the allegations of the complaint sounded in tort, the place of the wrong was Pennsylvania because "[t]he insurance contract at issue was created in Pennsylvania, the insurance agent and insurance adjuster are both located in Pennsylvania[,] and the location where the alleged bad faith acts or unfair practices of the insurer occurred is also Pennsylvania." Applying Pennsylvania law, the district court granted summary judgment for Travelers because Pennsylvania does not recognize a "cause of action by an injured third party against the insurer of the tortfeasor for bad faith" or unfair claims handling. Yost v. Travelers Insurance Co., No. 5:97CV113 (N.D. W.Va., May 18, 1998). The Yosts appeal.

II.

Because the propriety of a summary judgment presents a pure question of law, our review is de novo. Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997).

A.

There are three cardinal rules to the law of conflicts. First, the forum's law concerning conflicts of law applies. **3** This first rule has generally been of little significance because most American forums traditionally have followed cardinal rules two and three: tort cases are governed by the law of the place of the wrong (lex loci delicti), and contract cases are governed by the law of the place of contracting (lex loci contractus). West Virginia continues to adhere to these fundamental rules in most instances. See Blais v. Allied Exterminating Co., 198 W.Va. 674, 482 S.E.2d 659, 662 (1996) (lex loci delicti is "the

_____

**3** A corollary relevant here is that the forum state's law applies in diversity cases in the federal district courts. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 491 (1941).

4

cornerstone" of conflicts-of-law doctrine); <u>Johnson v. Neal</u>, 187 W.Va. 239, 418 S.E.2d 349 (1992) (lex loci contractus applies absent "compelling reason" to deviate from it).

These simple conflicts rules are, in most cases, readily applied. Still, there have always been harder cases. For example, the place of contracting need not be in the same jurisdiction as the place of performance or the location of an insured risk. In tort cases, the wrong may happen in one state and the injury in another. Consequently, courts have often rejected the rigidity of lex loci in favor of more flexible, but less straightforward, approaches.

These more difficult cases confront us with ever-increasing frequency. For one thing, the world is shrinking; both an order for goods and a libel can now circle the globe in seconds. For another, and more to the point here, legislatures and courts have frequently grafted a body of public policy duties onto contracts, particularly insurance contracts. Though sometimes deemed a tort or sometimes a breach of contract, the transgression of such a duty does not comfortably fit either label. Finally, the substance of these quasi-tort, extra-contractual duties varies widely among jurisdictions, making the choice-of-law issue often the dispositive one.

B.

The drafters of the second Restatement of Conflict of Laws tackled the challenges posed by the hardest cases. They fashioned a broad, multi-factor test for tort claims:[4]

> § 145. The General Principle
>
> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

_____

[4] Violation of W.Va. Code § 33-11-4(9) is considered a tort. <u>Poling v. Motorists Mutual Ins. Co.</u>, 192 W.Va. 46, 450 S.E.2d 635, 638 (1994).

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1971).

Section 6, in turn, provides:

§ 6. Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Id. § 6.

The Supreme Court of Appeals of West Virginia has criticized those jurisdictions that have adapted the Restatement approach for all conflicts-of-law questions, observing that those jurisdictions have unnecessarily created litigable issues over commonplace situations that the lex loci rules can handle predictably and with ease. Paul v. National Life, 177 W.Va. 427, 352 S.E.2d 550, 553-556 (1986). Nevertheless, the court has embraced the "fuzzy" Restatement test as the best means to address "particularly thorny" conflicts problems. Oakes v. Oxygen Therapy Services, 178 W.Va. 543, 363 S.E.2d 130, 131 (1987). We will therefore apply that test here.

III.

Section 145 of the Restatement sets forth four sorts of "contacts" to be taken into account, while § 6 lists seven "factors" relevant to the choice of law. We will examine the § 145 "contacts" first.

- The place where the injury occurred (§ 145(2)(a)) -- the Yosts are residents of Ohio, and the worry, annoyance, and economic hardship of the delay in receiving compensation would have been suffered there.

- The place where the conduct causing the injury occurred (§ 145(2)(b)) -- Travelers adjusted the claim from its Pittsburgh, Pennsylvania, office. Though it retained local (West Virginia) counsel to defend the Yosts' suit against Miller, Travelers directed his actions from Pittsburgh.

7

**-** The domicil, residence, nationality, place of incorpo-
  ration and place of business of the parties (§ 145(2)(c))
  -- the Yosts are residents of Ohio. Travelers is a Con-
  necticut corporation and is headquartered there; it does
  business nationwide.

  **-** The place where the relationship, if any, between the
  parties is centered (§ 145(2)(d)) -- the accident and the
  lawsuit are the only intrastate elements of the relation-
  ship between the Yosts and Travelers. Both occurred in
  West Virginia.

Those are the relevant "contacts." In and of themselves, they are a
mixed bag that points nowhere in particular. For perspective, we must
view them in light of the broad § 6 factors and West Virginia case
law.

The first factor -- the needs of the interstate system (§ 6(2)(a)) --
is a reminder of the interstate nature of commerce and many other
activities and of the need for harmonious relations between states. No
state should be overly eager to apply its own law to a dispute in which
some other state is more interested, even if the forum state is con-
vinced of the superiority of its own law. The final two factors
(§ 6(2)(f), (g)) simply give us goals -- predictability and ease of
application -- that may well elude us given the fact-bound nature of
the inquiry and the generality of the Restatement criteria.

The meat of the Restatement test is factors two through five
(§ 6(2)(b)-(e)). We will start with the last of these: the basic policies
of the area of law. The purpose of laws like WVUTPA is to ensure
fair play by insurance companies. More importantly for today's issue,
the character of such laws is protectionist. In other words, West Vir-
ginia's law is designed as it is in order to protect the citizens of West
Virginia. See Poling v. Motorists Mutual Ins. Co., 192 W.Va. 46, 450
S.E.2d 635, 637 (1994) (theorizing that the WVUTPA tort remedy
could ultimately reduce premiums by prompting quick settlements of,
and discouraging wasteful litigation over, meritorious claims).

Next we should consider West Virginia's particular policy
(§ 6(2)(b)) and that of other interested states (§ 6(2)(c)). As does West

Virginia, both Pennsylvania and Ohio prohibit bad-faith conduct by insurers. See 42 Pa. Cons. Stat. § 8371; Ohio Rev. Code § 3909.19 et seq. The states differ as to who may have access to the courts to enforce these prohibitions. Pennsylvania limits such actions to the first-party insured, see supra n.1; in Ohio, only the state's Superintendent of Insurance may sue. Strack v. Westfield Companies, 33 Ohio App.3d 336, 515 N.E.2d 1005 (1986). Thus, each state has weighed the interests of consumers and insurers and has struck a different balance.

This careful legislative balancing makes the last Restatement factor -- "the protection of justified expectations" (§ 6(2)(d)) -- all the more important, and it weighs heavily in favor of Pennsylvania law. Travelers is involved in this case solely on account of a contract with a Pennsylvania resident insuring Pennsylvania property, and surely both parties to that contract would be justified in believing that Pennsylvania law would govern Travelers' conduct. On the other hand, there is no evidence or suggestion that Mrs. Yost drove into West Virginia with the expectation that she could sue a third-party insurer should some calamity befall her.

On balance, then, we conclude, as did the district court, that Pennsylvania has the "most significant relationship" to the "occurrence" -- Travelers' alleged bad-faith conduct -- at issue here.[5]

_____

[5] We note that at least one district court in our circuit has stated expressly that lex loci contractus applies to suits under WVUTPA, and another appears to have implicitly assumed as much. Pen Coal Co. v. William H. McGee & Co., Inc., 903 F. Supp. 980, 983 (S.D. W.Va. 1995); Nowsco Well Service, Ltd. v. Home Insurance Co., 799 F. Supp. 602, 605-608 (S.D. W.Va. 1991).

We have no reason to doubt the correctness of the result in either Pen Coal and Nowsco, and we expect that, given the importance the West Virginia court has placed on the "justified expectations" of the parties to a contract, the Restatement test and lex loci contractus will generally point to the same forum. Nevertheless, because the West Virginia court does apply the Restatement's tort test to "thorny" tort cases, and violations of the WVUTPA sound in tort, it is conceivable that a plaintiff with more substantial ties to West Virginia than the Yosts could establish that West Virginia had the "most significant relationship" to his claim, notwithstanding an out-of-state insurer and insured.

9

Our conclusion that Pennsylvania law governs is buttressed by West Virginia case law applying the Restatement test. Oakes is the best example. There, the plaintiff, Oakes, was a West Virginia resident, but he had been employed in Maryland under a contract governed by Maryland law. He was injured on the job and received medical treatment for his injury in West Virginia. He applied for and began receiving Maryland workers' compensation benefits. His employer fired him after ninety days had passed and he was still unable to work, as it was permitted to do under the employment contract. The employer informed Oakes of this decision at a hospital in Martinsburg, West Virginia. Oakes sued in West Virginia, asserting that the discharge was in retaliation for his receipt of workers' compensation and that such retaliatory discharge violates West Virginia law.

Oakes' argument was simple: retaliatory discharge is a tort, he was discharged in West Virginia, and lex loci delicti applied. The Supreme Court of Appeals disagreed. It noted that lex loci delicti "has generally been applied to clear-cut cases of physical injury," while Oakes' case involved "an alleged tort whose very existence depends of the brea[d]th and legality of a Maryland employment contract." Id., 363 S.E.2d at 131. The court then consulted the Restatement factors and determined that Maryland law should apply. The court noted that the "protection of justified expectations" was particularly important to its holding, and that the only West Virginia connection to the actual dispute was an inconsequential happenstance, that is, Oakes' presence in West Virginia when he was fired. Id. at 132.

Here too we have an alleged tort, and here too the tort could not exist absent a contract governed by another state's law. Finally, in this case the connection with West Virginia was not only inconsequential, but also literally accidental. The applicability of West Virginia law does not turn on such a "fortuity." Lee v. Saliga, 179 W.Va. 762, 373 S.E.2d 345, 352 (1988).

IV.

There is one last issue. West Virginia adheres to the general view that, notwithstanding the applicability of another state's law, the forum state may decline to enforce laws it deems repugnant to its own

10

strong public policy. <u>Nadler v. Liberty Mutual Fire Ins. Co.</u>, 188 W.Va. 329, 424 S.E.2d 256, 262-265 (1992). This exception is necessarily a narrow one, to be invoked only in extraordinary circumstances.[6]

> We adhere to the general principle that a court should not refuse to apply foreign law, in otherwise proper circumstances, on public policy grounds unless the foreign law "is contrary to pure morals or abstract justice, or unless enforcement would be of evil example and harmful to its own people."

<u>Id.</u>, 424 S.E.2d at 265 (quoting 16 Am. Jur. 2d <u>Conflict of Laws</u> § 18).

There are sufficient similarities between <u>Nadler</u> and this case to assure us that the public policy exception does not apply here. In <u>Nadler</u> a family of Ohio residents, the Schoettkers, was involved in a two-vehicle traffic accident in West Virginia. Two of them were killed and five injured. The driver of the other vehicle was at fault, and his liability insurance paid the Schoettkers $325,000, the single-accident limit of the policy. Believing that this amount was insufficient, the Schoettkers made a claim against the underinsured motorist coverage of their own policy, which had been issued to them in Ohio. The limit of this underinsured motorist coverage was $300,000. Under Ohio law recovery from the underinsured's liability insurance may be set off dollar-for-dollar against this coverage. 424 S.E.2d at 260 (citing Ohio Rev. Code § 3937.18(A)(2)). Under West Virginia law the issuer of underinsured motorist coverage must pay the entire difference, up to the limit of the policy, between the recovery from the tortfeasor and the insured's actual loss. <u>State Automobile Mutual Insurance Co. v. Youler</u>, 183 W.Va. 556, 396 S.E.2d 737, 745 (1990).

There was no doubt in <u>Nadler</u> that Ohio law would ordinarily govern, because the dispute was over the meaning of a contract entered into in Ohio and was between the parties to that contract. Nonethe-

_____

[6] For two examples, see <u>Mills v. Quality Supplier Trucking, Inc.</u>, 203 W.Va. 621, 510 S.E.2d 280, 283 (1998) (common law contributory negligence rule's absolute bar to recovery will not be enforced in West Virginia forum); and <u>Paul</u>, 352 S.E.2d at 556 (so-called "automobile guest statutes" contravene the "strong public policy" of West Virginia).

11

less, the Schoettkers filed a declaratory judgment action in district court in West Virginia and sought to have West Virginia law applied under the public policy exception. The district court ruled for the insurer; on appeal, we certified the question to the West Virginia Supreme Court of Appeals.

The state court agreed that the public policy exception did not displace Ohio law, and its reasoning compels the same conclusion here. The court first recognized that foreign law does not offend the forum's public policy merely because it is less favorable to the wronged party than the forum's law would be. Nadler, 424 S.E.2d at 263. Next the court looked to the substantive law at issue to define the relevant West Virginia public policy:

> Our substantive law governing uninsured and underinsured motorist coverage in motor vehicle insurance policies is intended to apply only to insurance transactions which occur in West Virginia or which affect the rights or responsibilities of West Virginia citizens. For this reason, the public policy of full compensation underlying our uninsured/ underinsured motorist law is implicated only when the parties and the transaction have a substantial relationship with this state. The importance of the public policy is directly proportional to the significance of the relationship. The more marginal the contact West Virginia has with the parties and the insurance contract, the less reason there is to consider the public policy behind our uninsured/ underinsured motorist law as a factor bearing on the choice of law determination.

Id. at 264. The court thus concluded that the Restatement's "most significant relationship" test adequately addressed public policy concerns in the context of automobile insurance coverage. Id. at 264-265. In closing, the court reiterated that "[t]he only contacts with this state were the fact that the accident occurred here and was caused by a West Virginia resident." Id. at 265. Nevertheless, because the Schoettkers were Ohio residents, application of Ohio law "will not have an adverse impact on the citizens of this state." Id.

12

From the standpoint of the public policy exception to application of foreign law in a West Virginia forum, this case is indistinguishable from, and is therefore controlled by, Nadler.[7]

For the foregoing reasons, the judgment of the district court is affirmed.[8]

AFFIRMED

---

[7] The court reached a similar result in yet another case involving an out-of-state automobile insurance policy in Johnson v. Neal, 418 S.E.2d at 352 (Virginia law permitting anti-stacking clauses for uninsured motorist coverage did not violate strong public policy of West Virginia).
[8] The Yosts' motion to certify a question to the Supreme Court of Appeals of West Virginia is denied.

13